[S. F.   No. 9824.   In Bank.—January 30, 1922.]

## PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Petitioner, v. FRANK R. DEVLIN et al., as Members of the Railroad Commission, etc., Respondents.

[1] PUBLIC UTILITY—FIXING VALUATION OF WATER PLANT—PROCEEDING BEFORE RAILROAD COMMISSION—RIGHT OF OWNER.—In a proceeding before the Railroad Commission, under the provisions of section 47 of the Public Utilities Act, to fix the amount of compensation to be paid by a municipal corporation for a water plant consisting of reservoir and distributing system owned and operated in the city by a public service corporation, the latter is entitled to a finding of the just value of its plant as of the date of the filing of the application by the city, and a just value is the actual or fair market value of the property in its then condition.

[2] ID.—FINDING OF COMMISSION — APPROXIMATION TO ESTIMATE OF ENGINEERING DEPARTMENT—PRESUMPTION.—In such a proceeding, it does not follow from the fact that the total valuation found by the commission is closely identified with the estimate of its own engineering department that the commission followed in detail the schedule of items and values set out in such estimate, and the law will presume that the result was reached by incorporating valuations at different prices and on other elements of the system gathered from the estimates of other engineers rather than in-

188 Cal.—3

dulge the inference that matters presented and supported by competent evidence were ignored.

[3] ID.—FINDING AND DECISION OF COMMISSION—SUPPORT BY COURT.—In such a proceeding, the general finding of the commission is like the general verdict of a jury, not open to attack for insufficiency if supported by any reasonable construction of the evidence, and if the decision is regular on the face of the record, it will be supported by every presumption that follows a judgment of a court of record.

[4] ID.—ESTIMATES OF ENGINEER OF COMMISSION — ACCEPTANCE AS BASIS OF FINDING.—In such a proceeding, the decision of the commission is not necessarily open to attack even if it adopted and followed the estimates and evidence of its own engineer, since under the Public Utilities Act the commission has authority to call a witness at its own instance and even against the will of the owner of the utility on the subject of the value of the property, and unless its engineer has omitted some material element of valuation or introduced some erroneous measure of appraisement into his report and testimony, the commission has the right to accept such evidence as the basis of its finding.

[5] ID.—DECISION OF COMMISSION—OMISSION OF ITEM OF VALUATION—CERTIORARI—EVIDENCE.—In a proceeding in *certiorari* to review a decision of the Railroad Commission fixing the valuation of the property of a public utility, it is essential, in order to avoid the decision on the ground of an alleged omission of an item, that the record affirmatively and satisfactorily show that the item is not included, and it is not enough that the record does not affirmatively show that it is properly accounted for.

[6] ID.—PRELIMINARY AND ORGANIZATION EXPENSES—ALLOWANCE AS OVERHEAD EXPENSE—PRESUMPTION.—Where in a proceeding in *certiorari* to review the order of the Railroad Commission fixing the valuation of a water plant of a public service corporation there is room in the report of the commission's engineer for reasonable allowance for preliminary and organization expenses of the plant under the caption of overhead expense, it will be presumed in support of the decision that the allowance was so included.

[7] ID.—DEPRECIATION OF PLANT—METHOD OF DETERMINATION.—The matter of depreciation of a water plant which is mostly underground and not open to careful inspection must be largely a matter of estimate and speculation based upon common observation and experience under similar conditions, and the "straight line method," based upon the proportionate part of the estimated life of the system which has expired, rather than the "sinking fund method" or any of its modifications, is the appropriate basis for the purpose of determining the present value of the utility.

PROCEEDING in Certiorari to review an order of the Railroad Commission fixing valuation of a water plant. Order affirmed.

The facts are stated in the opinion of the court.

Charles P. Cutten and R. W. Du Val for Petitioner.

Hugh Gordon and William W. Clary for Respondents.

F. P. Tuttle and F. P. Tuttle, Jr., for City of Auburn.

SLOANE, J.—This is a proceeding to review a ruling of the Railroad Commission of the state of California, fixing the amount of compensation to be paid to the petitioner, Pacific Gas and Electric Company, by the city of Auburn, a municipal corporation, in Placer County, California, for a water plant consisting of reservoir and distributing system, owned and operated in said city by the petitioner.

The hearing before the Railroad Commission was had pursuant to the provisions of section 47 of the Public Utilities Act. The only questions raised are as to whether or not the commission in arriving at its valuation of the water property regularly pursued its authority under the act, and granted to the petitioner its constitutional right to just compensation.

The decision complained of followed a hearing on the application of the city of Auburn filed on the 10th of May, 1918. After hearings the commission on September 27, 1920, announced and filed its opinion, findings of fact, and decision, in which it determined the "just compensation to be paid by the city of Auburn to Pacific Gas and Electric Company for its public utility water system supplying water to consumers of said city . . . in the sum of fifty-two thousand dollars." It is recited in the opinion that the valuation was reached upon hearings had at which all interested parties were given an opportunity to appear and be heard and in which appraisals were filed by engineers representing the city of Auburn, the Pacific Gas and Electric Company, and the Railroad Commission. It is further stated in the opinion as follows:

"Two appraisals were filed by the engineers for the commission; one based upon prices of labor and material prevailing during the five year period from 1913 to 1917, inclusive; the second appraisal being based upon prices prevailing during a six months construction period ending May 10, 1918, the date of the filing of the application. Thus the principles heretofore established have been adhered to; i. e., the date of the valuation is as of the date of the filing of the application, and prices of labor and material prevailing over a reasonable construction period prior to the date of the appraisal have been used in estimating unit costs. All factors relating to the condition of the properties in question were taken into consideration in arriving at an estimate of reproduction cost less depreciation.

"Inasmuch as it was stipulated at the hearing in this matter that the commission might add to its findings of value the value of any additions, betterments and improvements of the system which were made a part of the system subsequent to May 10, 1918, the date as of which the valuation was submitted, in accordance therewith the net expenditures of the company for betterments and improvements during the period May 10, 1918, to April 30, 1920, are included in the findings herein."

Upon an application for rehearing demanded by the petitioner on the alleged ground, among others, that contrary to the requirements of subdivision 4 of section 47 of the act, the valuation was fixed as of the date April 30, 1920, instead of May 10, 1918, the date of the filing of the original application of the city of Auburn, and without the taking of further testimony, the commission on March 31, 1921, made its amended findings and order, in which it fixed the valuation of the plant as of May 10, 1918, at the same figure as in the original order, namely, fifty-two thousand dollars. The amended decision contains the following recital:

"Inasmuch as technical objection has been made to this course of procedure, it appears that a finding of just compensation should be made as of May 10, 1918, the date of filing of the original application, and after a careful consideration of all of the elements pertinent to a final conclusion herein, and all of the items going to make up the value of the properties sought to be acquired by the city of Auburn

in this proceeding, including all matters presented in the application for rehearing, it appears that the just compensation to be paid by city of Auburn to Pacific Gas and Electric Company for said property is the sum of fifty-two thousand dollars, and that the application for rehearing should be denied.''

We do not understand that petitioner is relying upon the objection that the commission exceeded its jurisdiction in amending its decision, but rests upon the contention that in the matter of allowing compensation the commission did not ''regularly pursue its authority,'' or protect the petitioner in its constitutional guaranties, by fixing a ''just compensation.'' It is not questioned that both parties to the proceeding before the commission were allowed full scope in the introduction of evidence, and no objections are made as to either the introduction or exclusion of evidence.

Petitioner's case is presented under the following heads:

''1. The commission found that the estimated reproduction cost new of the Auburn City Reservoir on May 10, 1918, amounted to the sum of $10,822 (Commission Ex. No. 2, p. 8), whereas the evidence shows the reproduction cost new to be $11,131.75.''

''2. The commission failed and refused to find or allow any value or compensation for sixty-eight fire hydrant connections in the face of uncontradicted evidence of a reproduction cost of said property of $367.36.''

''3. The commission failed and refused to find or allow any value, or compensation, for the preliminary and organization expenses, in the face of uncontradicted evidence of a cost or value of $5,150.''

''4. The commission adopted and employed the theoretical 'straight line method' of depreciation in determining the depreciated value of petitioner's depreciable property in the face of undisputed evidence that a depreciated value arrived at in this manner bore no relationship to the actual depreciated value of the physical properties, nor the amount of depreciation that had actually accrued.''

''5. The commission found that the depreciated value of petitioner's entire physical properties and lands, as of May 10, 1918, amounted to $51,063 in the face of undisputed evidence that the depreciated value of said proper-

ties and lands determined from a consideration of the actual physical condition of the properties, as evidenced by inspection, and the use of the tables adopted by the Railroad Commission for the identical properties, was the sum of $75,736.''

''6. The commission failed and refused to find or allow any value in excess of the sum of $937 for petitioner's business or going concern in the face of evidence presented by petitioner of a special value, in addition to the value of the tangible properties, of twelve thousand five hundred dollars, and in the face of evidence presented by the city of Auburn of a going concern value of three thousand dollars.''

[1] It may be at once conceded that petitioner in this proceeding before the Railroad Commission was entitled to a finding for the just value of its water plant as of the date of the filing of the application by the city of Auburn, and that a just value was the actual or fair market value of the property in its then condition; that to arrive at such valuation it was the duty of the Railroad Commission to take into account every element of the plant which was actually used and reasonably required for the storage and distribution of water to the city of Auburn and its inhabitants, on May 10, 1918, and which entered into and remained a part of the cost of its construction; and also to resort to and apply reasonable and recognized measures of value to each constituent element going to make up such water system. And it follows that, if in such appraisement any constituent element of value was omitted, or any illegitimate measure of value applied, to that extent petitioner would be deprived of his property without compensation, or due process of law, and by a process in excess of the jurisdiction of the Railroad Commission.

Returning to petitioner's specifications, it may be said generally that there is nothing in the record to show that the commission did not regularly pursue its authority, or that its decision was not supported by the evidence.

The only finding provided for on such a hearing, as declared in subdivision 4 of section 47 of the act, is, that ''When the proceeding has been submitted, the commission shall make and file its written finding fixing in a single sum, the just compensation to be paid by the political sub-

division for said lands, property and rights, or said part or portion thereof: provided, that if the commission finds that severance damages should be paid, the just compensation for such damages shall be found and stated separately."

There was no finding for severance damages, and it does not appear that any was demanded. The commission made its findings in a single sum to include the valuation of the entire plant. It is not disputed that competent evidence covering every element of value claimed by petitioner was introduced and argued before the commission. Its finding was in a lump sum for fifty-two thousand dollars. How can it be said that any constituent element going to make up the market value of the property was left out of the appraisement or improperly measured?

The record shows and the opinion of the commission recites that: "The city's appraisal was based upon prices of labor and material prevailing during the six year period from 1911 to 1916, inclusive. The appraisal presented by the Pacific Gas and Electric Company was based upon prices of labor and material prevailing on May 10, 1918, the date of filing the application herein. The Engineering Department of the Railroad Commission made extensive field investigation of the water system in question, and based its appraisals upon the data thus secured and from an inspection of the Company's records."

The various engineers testified fully in support of their separate estimates. There was considerable. variance in these estimates. That of the engineer for the city of Auburn aggregated a present value of $28,838; that of the engineer for the commission aggregated $51,063, and that of petitioner's engineer aggregated the sum of $86,236.

Each estimate was made on a basis of the cost of reproduction, less the accrued depreciation. Between the valuations testified to under the lowest and highest estimates there was room to include every item claimed by petitioner within the valuation of fifty-two thousand dollars adopted by the commission.

Petitioner, however, contends that the commission adopted *in toto* the estimates of its own engineer, which aggregated $51,063, and that such estimates entirely omitted the item of preliminary organization and administration expenses

incident to constructing such a water system, and but partially covered outlays in the production of the plant.

If the record discloses that the commission acted solely on the data contained in the schedule of its engineer, and that this failed to incorporate some of the elements of proper valuation disclosed by other competent evidence, the decision of the commission should be set aside.

[2] It does not follow, however, from the fact that the total valuation found by the commission is closely identified with the estimate of its engineer, that the commission followed in detail the schedule of items and values set out in such estimate. It may have reached the same result by incorporating valuations at different prices, and on other elements of the system, gathered from the estimates of the other engineers. (*Union Hollywood Water Co.* v. *City of Los Angeles*, 184 Cal. 535 [195 Pac. 55].)

The law will presume that such was the fact rather than indulge the inference that matters presented and supported by competent evidence were ignored.

It may be true that the analysis of the items and figures of the report of the commission's engineer would be persuasive evidence in support of petitioner's contention on a trial, but they are not sufficient to impeach a judgment.

[3] This general finding of the commission is like the general verdict of a jury, not open to attack for insufficiency if supported by any reasonable construction of the evidence. It is doubly fortified in this respect, as the Public Utilities Act in the section authorizing the procedure here under review expressly provides, "that the finding of the commission as to just compensation shall be final and shall not be subject to modification, alteration, reversal or review by any court of this state." This is subject, of course, to the qualification that the commission must have regularly pursued its authority, and have acted upon competent evidence, and, as corollary to this, that it has not ignored or failed to consider any competent evidence; but any ground of attack upon the regularity of its proceedings must be clearly established. If the decision is regular on the face of the record it will be supported by every presumption that follows a judgment of a court of record. (*Clemmons* v. *Railroad Commission*, 173 Cal. 254 [159 Pac. 713]; *Marin Water Co.* v. *Railroad Commission*, 171 Cal. 706

[Ann. Cas. 1917C, 114, 154 Pac. 864]; *Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119].) "An appellate court will not interfere with the report of commissioners in the assessment of damages to correct the amounts reported except in case of gross error showing prejudice, corruption, or plain mistake." (*Shoemaker* v. *United States,* 147 U. S. 282 [37 L. Ed. 170, 13 Sup. Ct. Rep. 361, see, also, Rose's U. S. Notes].)

[4]  Even if, however, as petitioner claims, the commission adopted and followed the estimates and evidence of its own engineer, its decision is not necessarily open to attack on that account. The commission engineer was a competent witness, he had made a special investigation of the water system under consideration, and the Public Utilities Act makes provision that upon such hearing "evidence may be presented by the political subdivision, by each owner as claimant named in the petition, and by the commission," and the commission has authority to call a witness at its own instance and even against the will of the owner of the utility, on the subject of the value of the property (*Marin Water & Power Co.* v. *Railroad Commission, supra*). Unless, then, its engineer omitted some material element of valuation or introduced some erroneous measure of appraisement into his report and testimony, the Railroad Commission had a right to accept such evidence as the basis of its finding, to the exclusion of other evidence that it may have considered less satisfactory.

Petitioner claims, first, that, in appraising the reproduction cost of the Auburn city reservoir, the estimate of $10,822 of the commission's engineer was but tentative, whereas other undisputed evidence fixed the reproduction cost at $11,131.75. The variance in these valuations arose from a difference in the estimates of the yardage of excavation under the embankments of the reservoir, or stripping of the surface soil, in preparing a foundation for the embankments.

No actual inspection or measurement could be made. The estimates of all the witnesses were largely a matter of deduction and opinion. Mr. Givan, the engineer of the city of Auburn, testified that after as complete an investigation as he could make he could find no evidence of any such stripping excavation, and gave reasons why he thought it was not

there.  Mr. Ryan, the engineer for petitioner, estimated the excavation at 3,350 cubic yards, allowing fifteen feet of stripping under the embankments.  Mr. Faude, the commission's engineer, estimated three thousand two hundred cubic yards, with an allowance of eight feet of stripping.  He testified that on account of the other engineers not being able to agree on yardage of reservoir, he adopted three thousand two hundred cubic yards as tentative, that he did not do this altogether as adopting the medium between the other estimates, but that he made some computations, not accepting the quantities of either side.  If the commission had adopted the conclusion reached by Mr. Givan and made no allowance at all for the stripping excavation, we do not see how its finding could be impeached.

The next specification by petitioner is the alleged failure to include in the valuation sixty-eight fire-hydrant connections of the value of $367.67.  This item was included in Engineer Ryan's estimates, but not in those of either Engineer Givan or Engineer Faude, at least not specifically.  There are two elements of uncertainty as to the legitimacy of this claim.  One is that there was some ground for inference that the city had previously paid for these connections when the hydrants were installed, the hydrants having been paid for by the city; the other is the contention of respondent that allowance of the amount due, if any, on this item, may have been included as an allowance for contingencies in Engineer Faude's estimate for overhead costs.

[5] In any event, it does not sufficiently appear that petitioner has in this particular been denied any just compensation.  It is not enough that the record does not affirmatively show that this item is properly accounted for.  It must, in order to avoid the decision, be affirmatively and satisfactorily shown that it is not included.

It is conceded that if the petitioner corporation owns these hydrant connections it is entitled to have their value computed in the commission's valuation, irrespective of who paid for them.

[6] A more important contention of petitioner is that under Engineer Faude's estimate no allowance was made for preliminary and organization expenses, which appear upon Engineer Ryan's estimate as supported by the evidence, in the sum of $5,150.  It is conceded by respondents that the

reasonable cost of such preliminary work of preparing for the construction of such a water system is a proper charge in estimating its reconstruction value. No specific allowance is made for this cost in the report of Engineer Faude for the commission. Such report, however, contains an estimate under the caption of overhead expense, for administration, engineering, interest, and incidentals. If there is room for reasonable allowance on this claim for preliminary expenses in this overhead estimate, and there appears to be, it will be presumed in support of the finding of the commission that it was so included.

Petitioner argues that such a method of classification is contrary to the rule of the commission as established in its "Uniform Classification or Accounts for Water Corporation," and quotes from such classification that organization charges shall be charged to "intangible capital." It must be remembered, however, that this estimate and report of the engineer is not a finding of the commission, but evidence that was before it, and in construing his report it was privileged to get out of his estimates whatever he may have put into them under whatever classification he may have used. It is claimed by respondents that it is customary practice to include preliminary organization costs as overhead expenses in such estimates as this, citing *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153 [59 L. Ed. 1244, 35 Sup. Ct. Rep. 811], where the master in chancery who heard the case says that time and money expended in the promotion of the enterprise, the organization of the company, legal expenses, preparing plans and specifications, etc., are properly termed "overhead charges."

[7] The most urgent objection to the valuation of property arrived at in this proceeding is on the alleged ground that the commission resorted to an unfair and unauthorized method of fixing the amount of depreciation in the value of this water system. As has been stated, the value as of the date of May 10, 1918, was reached by all of the engineers by estimating the cost of reproduction of the plant and deducting from the amount the deterioration in value suffered during the life of the system up to such date.

Engineers Faude and Givan, in their estimates, used what is known as the straight line method, while Engineer Ryan,

for the petitioner, used what is known as the sinking fund method in estimating deterioration.

The straight line method consists in calculating from examination and experience in like constructions the total life period of the constituent parts of the plant, and then deducting from their value that proportion of decrease represented by the ratio of the years it has been in use in relation to the entire life period. For example, if the estimated life is fifty years and twenty-five years of that time has elapsed, it is assumed that the value has depreciated fifty per cent. The sinking fund method is more complicated and consists, as we understand it, in charging for depreciation an annual sum which with compounding interest thereon will at the termination of the estimated life of the investment replace the original cost, and if cut off at any given period the accumulation will represent the depreciated value to that date.

It is not important, however, in this instance to determine just how the results are attained, as it seems to be conceded that the amount that would be allowed for depreciation in the present case is less by the sinking fund than by the straight line method, and it is claimed that the commission has erroneously followed the straight line method, in its appraisement under consideration, to petitioner's prejudice.

Assuming that the Railroad Commission reached its conclusions by the straight line method, which assumption rests in turn upon the claim that the commission followed the method of its own engineer rather than that of petitioner's engineer in this respect, which is not clear from the record, was it an error in the exercise of its jurisdiction?

The law has not settled the question and the expert witnesses seem to disagree. Two of the engineers used the straight line method, and supported their actions by their expert opinion that the method was proper and fair. Counsel for petitioner cites instances from other investigations of public utility values where the commission adopted the sinking fund method, and quote from an opinion of Commissioner Thelan, in the *Matter of the Application of the City of Palo Alto, etc.*, 11 C. R. C. R. 209, which was a proceeding under section 47 of the Public Utilities Act, as follows:

"I have been much impressed by the gas company's argument that in view of the fact that in a rate case the depre-

ciation annuity in this state must be estimated on the sinking. fund basis (section 49, Public Utilities Act; *Town of Antioch* v. *Pacific Gas and Electric Company,* Vol. 5, Opinion and Orders of the Railroad Commission of California, pp. 19, 39, 40), the same basis should be applied, in depreciating the property, in an eminent domain proceeding. While not intending to lay down any rule which must be uniformly followed hereafter by this commission, I have given due weight to the gas company's contention on this point.''

It will be noticed that the learned commissioner does not attempt to announce any rule of law or established method of engineering computation as governing this method of determining depreciated value, and it is not apparent whether the use of one or the other of these recognized methods should be governed by physical conditions of the public utility which the evidence in the particular case might develop.

It is obvious that this matter of depreciation, particularly in a property which is mostly underground and not open to careful inspection, must be largely a matter of estimate and speculation based upon common observation and experience under similar conditions. It is a matter of approximation at the best, and to the lay mind it would appear that the straight line method, based upon the proportionate part of the estimated life of the system which has expired rather than the sinking fund method or any of its modifications, is the appropriate basis for fixing depreciation for the purpose of determining present value of the utility.

A distinction may be drawn and has been frequently recognized between a rate-paying appraisement of a public utility and an appraisement of value to determine its worth in condemnation proceedings, in the application of one or the other of these methods of fixing the depreciation.

In rate-fixing the end sought is a reasonable return to the public utility for its use in the public service. Such reasonable return logically should be upon a basis that will pay a certain profit and replace the property at the end of its life. The sinking fund method is commonly used in such connection. In condemnation proceedings a different end is sought. Past costs or future replacements are only per-

tinent as a means to the end of determining present value in such proceedings.

If the actual physical condition could be determined by actual test and inspection, that, of course, would give the most satisfactory results; but, in the absence of such direct appraisement, the natural method would seem to be to ascertain from the life tables of such utilities and from such examination as can be made the prospective life of the commodity, and apportion the depreciation according to its age. The following California public utility cases are cited as upholding the straight line method: *Southern California Edison Co. Case,* 11 C. R. C. D. 83; *Marin Water & Power Co.* v. *Railroad Commission,* 6 C. R. C. D. 507, 520; *Northern California Power Co. Case,* 17 C. R. C. D. 98. Respondents also quote from the case of *National Telephone Co., Ltd.,* v. *Postmaster-General,* 16 A. T. & T. Co. Com. L. 491, Jan. 13, 1913; 2 Whitten's Valuation of Public Service Corporations, page 1112, as follows:

"Two methods of depreciation have been put before us and two different ways of regarding the life of the plant. The two methods have been described as the sinking fund method, which has been put forward by the company, and the straight line method, which has been put forward by the Postmaster-General.

"The sinking fund method is based upon the effect of compound interest . . . This seems to me to be purely a revenue question, and to have nothing to do directly with the value of the plant as between a vendor and a vendee. It was admitted by the very eminent witnesses called for the company upon this point that this method had never in their experience been applied as between a buyer and a seller. I admit this method will give you a perfectly correct arithmetical result, but it does not take into consideration those matters which properly affect the mind of a buyer. . . . I come to the conclusion, therefore, that the Postmaster-General's method of depreciation, which is the ordinary straight line method, is that which should be applied. In this method the value is reduced in the ratio which the age bears to the life of the plant."

As to the final objection discussed by petitioner, the alleged failure of the commission to follow the evidence as to going concern value, it is conceded that some allowance was

made on this claim. As has been said of all other segregated items, we find nothing in the record to determine what portion of the fifty-two thousand dollars appraisement was allotted to this claim under the general finding of the commission. Engineer Faude did not make any allowance for going concern value in his estimate, and under petitioner's theory that the fifty-two thousand dollars total allowed in the findings was made up of the items specified by Mr. Faude aggregating $51,063, and an additional amount of $937 thrown in for good measure, it is assumed that the going concern value, if any, was confined to all or part of this latter amount. Conceding this to be the fact, the commission must necessarily have considered the matter, and reached a conclusion thereon. It cannot be said that there was no evidence to sustain this allowance, even if confined to the amount conceded.

It is true that Mr. Ryan, for the petitioner, estimated the going concern value at thirteen thousand five hundred dollars, and Mr. Givan estimated it at three thousand dollars, but Mr. Faude made no allowance for this item and stated in his testimony: "My investigations did not convince me there was very much going concern value there." It seems to have been conceded that the plant had not been on a profitable basis, and Mr. Ryan, in explaining his views in that particular, stated that he felt "that the company should not be at this time barred from any hope of ever realizing any going concern value by condemnation proceedings," and that "the effect of condemnation would be to deprive the company of the expectation of ever realizing anything from the money expended."

Going concern value is speculative enough when based upon past achievements, but when it depends upon future developments it becomes largely conjectural. The city of Auburn is a small town with no great realization in growth of population in the past nor expectation for the future. Its water distribution must be more or less of fixed quantity with no great hope of expansion. Even if the commission fixed the going concern value of this plant within the $967 allowance, we cannot say that it "has not regularly pursued its authority" in this respect.

All of this discussion of the items of valuation covered by the general finding of the commission has been predicated upon the assumption that the commission accepted and fol-

lowed the estimate of Engineer Faude as to the elements of valuation placed upon the concomitant parts of the plant. As already suggested, the only foundation for such a conclusion is the fact that the appraisement of the commission adopts approximately the same valuation as is reached by the aggregate of the estimates of separate elements of the system by the engineer. In support of this theory counsel for petitioner produce in their brief a memorandum prepared by Mr. Faude, which they state was handed to them subsequent to the original decision, by one of the commissioners, and which it is asserted shows in detail the manner in which the finding of the sum of fifty-two thousand dollars was reached. This memorandum adds nothing to the explanation of the commission's appraisement which was not already obvious, namely, that the commission added a certain sum to Mr. Faude's totals of $51,353, which, as the report states, was then "rounded off to fifty-two thousand dollars," as a "reasonable value for sale purposes, including going concern value and all intangibles as of April 30, 1920." This was by the amended decision adopted as the value as of the date of May 10, 1918. As to how the various elements of value were considered and distributed by the commission to make up this total does not appear, even accepting this report as part of the record.

It may be properly assumed in support of the decision of the Railroad Commission, which is entitled to every presumption in its favor, that without accepting the appraisements in detail of each item of cost and depreciation of its own engineer, the commission may have concluded in the light of all the evidence that he had reached in the aggregate a fair valuation for the entire plant, and, as the report quoted by petitioner says, by adding a few hundred dollars rounded it to fifty-two thousand dollars as the just value of the entire system.

The order and decision of the Railroad Commission is affirmed.

Shaw, C. J., Lawlor, J., Lennon, J., Waste, J., and Wilbur, J., concurred.

Rehearing denied.

All the Justices concurred.